May it please the court, I'm Jennifer Best on behalf of Friends of Animals. I would like to reserve two minutes for rebuttal. We'll have to help keep track of your time. Thank you. This case challenges permits that negatively affect barred owls and spotted owls in an area of intertwined federal, state, and private lands. Specifically, the federal government approved an experiment on federal land to study the feasibility of killing barred owls to open up habitat for threatened northern spotted owls. Counsel, let me just get right to the issue that I would like you to address because we're talking here about standing and I definitely just again speaking for myself I think there in the two areas I had some difficulty not with the Coast Ranges area but with the Coast Range and there's only one declaration about that if I am not mistaken and the declaration seems pretty non-specific it's in sharp contrast to the discussion of Coast Range where she says I've been to this campground and I've stayed here and it struck me in particular that it talks about traveling across Douglas County taking her through the study area and if you look at the map I-5 goes through the study area and across Douglas County so I mean it's so non-specific she doesn't even say she stops there or I just have difficulty seeing that with respect to the Klamath area it's sufficiently particularized. Could you respond to that? Yes, Your Honor. She does say that she has numerous travels for camping and for hiking and bird-watching so she does say that she stops and goes in these areas. No, she doesn't. She says she travels across Douglas County for camping and hiking and it's taken her through the area. It seems very carefully worded to avoid saying she actually has spent any time in those areas and particularly when you describes her visits to the other area. Well, Your Honor, I believe what was intended when she said she travels through for camping and hiking was that she camps and hikes in that area. But she doesn't ever say that. Also, Your Honor, to help explain what's going on in this area if you look at the actual maps in this area for example in the supplemental excerpts of the record at page 9 you'll see that it is very checkerboard throughout the entire study area. The Fish and Wildlife Service explained that the parcels of land are sometimes less than one square mile might be cover both federal, private, and state land. So she basically explained that she goes through these areas is showing that she is going through private, state, and federal land. The Fish and Wildlife Service also explained that the entire purpose of this experiment was because these lands are so intertwined and in that area the spotted owls and barred owls move across. But she has the burden to demonstrate standing, correct? And it just seemed highly ambiguous to me that a person who actually just drove down I-5 and loves to camp and hike could write this exact same affidavit without ever having gone to the study area and stopped there and camped there or hiked there within the area. Right, and I believe what she was getting at is that she travels there to camp and hike in the area and going through the area and saying that she has an interest in that specific area is sufficient to establish standing when the area is so intertwined and when they're killing barred owls throughout the entire area. And in fact the Ninth Circuit previously determined that Ms. Zucker in fact did have sufficient interest in these areas to have standing to challenge the barred owl removal experiment. So in footnote 2 of that earlier decision it was Ms. Zucker's affidavit? Yes, Your Honor. It referenced that there was two affidavits that were both sufficient and one of those was Ms. Zucker, correct? But that was focused on barred owls that are much more prevalent, right? Now we're looking at the she has standing to object to those. To clarify, the standing here is still her interest in both barred owls, based on her interest in both barred owls and spotted owls. But the permit only affects the barred owls that are living on the lands that otherwise the government couldn't get to, correct? Correct, Your Honor, but as I mentioned earlier the owls regularly travel throughout all the and when the support to Judge Graber's concern about the declaration is that she's very specific about the other area, right? She lists the campgrounds. The Oregon Coast area, right? Exactly where she's going and when she was there and I plan to visit these areas next summer and she names the campgrounds and so on. But the contrast between that and the very in passing declaration about the Klamath area seems to suggest, she doesn't say she even stops. She says she goes through it for hiking and camping but the hiking and camping could be somewhere else entirely. In fact, it probably is or she would have said otherwise. So one assumes that this distinction in specificity and clarity, you know, is an honest person not wanting to say more than she actually does in the Klamath area, which is drive through it in some place or other. With all due respect, Your Honor, the case here does challenge five separate permits and four of those permits are occurring in the Oregon Coast Range Studies area where she is much more specific and a larger portion of the area does occur in the Oregon Coast Range. I just want to clarify. In theory, it is possible that she has standing with respect to the coastal area and not Klamath or vice versa depending on what it said. So it isn't an all-or-nothing proposition. Am I right about that? Correct, Your Honor. In theory, it's not all-or-nothing. She could have standing with respect to four permits and not the other. However, as I mentioned earlier, this Ninth Circuit already determined that her interest was sufficient in both study areas to establish standing. Was it the identical declaration or do we know the answer to that? I believe they were similar but I cannot for sure say if they were the identical declaration. That declaration was submitted before. Your argument to this would be, number one, we did look at it and it wasn't just that the government didn't contest it. It's that the court specifically said we satisfied ourselves, number one. Number two, there isn't law that requires a citizen who enjoys things, a birder, to ever pinpoint the precise error, especially in a case where owls fly and they fly a long way. So that assembly of facts is your argument. She's shown sufficient injury to be able to make her argument. Exactly, Your Honor. She has shown sufficient injury. The difficulty that the district court had, its focus was not on concreteness, I don't think. Its focus was on these are theoretical owls that may come in the future. In fact, the whole thing is an experiment. So therefore, it's contingent. It has to be not impending. You lose. Well, there's two issues that I would like to point out there. First of all, what was overlooked by the district court is that it's not theoretical at all that they will be killing barred owls on these permanent areas. That is imminent and that was never disputed by the Fish and Wildlife Service or by the district court. It overlooked that as soon as these permanent issues, Fish and Wildlife started shooting the barred owls and it continues to shoot the barred owls today. I have a question about that. If, suppose we found standing on that basis, I mean, don't you then lose the merits automatically because you've already lost the merits with regard to killing the barred owl in another case? No. So therefore, I mean, in other words, if you can't connect yourself to the spotted owls or connect these people to the spotted owls, isn't this a futile case? No, Your Honor. The cases are very distinct because there is a different standard of review. There are different permits. That permit was issued under the Migratory Bird Treaty Act. This permit was issued under the Endangered Species Act. But your argument about the treaty, what's wrong with it, is the Endangered Species Act and the barred owls are not an endangered species. So if your problem is you're concerned about barred owls, the merits of the case are disconnected from that. Well, I think you are a little bit confusing the merits and the standing, which are slightly separate. For example, the Supreme Court said in Bennett v. Speer that one doesn't have to have an interest in a specific endangered animal to have standing under the Endangered Species Act. In that case, the plaintiffs weren't interested in any animals at all. They had economic interest in water. So you're telling me that if we concluded that her only standing was her concern for barred owls, that the rest of this merits case could go on even though it's really about spotted owls? Yes, Your Honor. All that is required for standing is that the plaintiffs show a sufficient interest in the affected area or animal that is injured by defendant's conduct. That is met here, but by both their interest in barred owls and spotted owls, which each are sufficient to establish standing. But if you are concerned about the interest in spotted owls, she also sufficiently demonstrates an interest in spotted owls to demonstrate standing. I'd like to talk a little bit about that. Defendants kind of indicate that there is a very high burden for standing, that you have to be literally certain that the harm will come about. But that's not the standard articulated by the Supreme Court or the Ninth Circuit. In fact, in Clapper, the Supreme Court said that it does not have to be certain that the harms they will come about, and it mentions that there's also a significant risk standard. This has been affirmed by the Supreme Court in Susan B. Anthony and also by this circuit when it's saying that if there is a significant risk that the harm will come about, that is sufficient to show standing. Here, it's not disputed that the permittees will actually take, will be likely to take spotted owls. It's enough to meet that significant risk or it is not the highly speculative or a highly attenuated chain of possibilities that was discussed in Clapper. Rather, Fish and Wildlife Service admits the entire purpose of these permits is they think that spotted owls will in fact be taken and their habitat will be permanently destroyed. And it admits in its answer that this is likely, this is exactly the significant risk or the credible threat that the Ninth Circuit and the Supreme Court has held is sufficient to establish standing. Therefore, our members who have an owl species, either one is sufficient to show standing, but both is more than sufficient to show that they do have standing. One other question. The defendants argued the merits of this case at some length in their brief. You didn't in your opening brief and you did a little bit in your reply brief, but is it your suggestion that we should, if we thought you had standing, we should reach the merits or not reach the merits? Yes, Your Honor. It is the discretion of the court to reach the merits. I know that. That's why I'm asking you. Yes, we think they are, they are fully briefed and we are concerned that owls are being continually killed during this. You didn't brief it at all in your opening brief. We did not brief it in our opening brief. Why wouldn't we remand that to the district court if we thought there was standing? That court never reached the merits and ordinarily, ordinarily we don't. Yes, and that is why we didn't brief it in our opening brief and we kind of didn't understand if the court were to remand it to fully address those. Could you mention for one second until I just ask you this? They're rather complicated questions as I understand. It's a very arcane issue about a specific subcategory of ESA problem about this particular kind of permit and so on, which at least I've never seen before and I don't know if there's any case law. Yes, Your Honor. If the court believes they do not have sufficient briefing in front of them, then we would ask them to remand it back to the district court. But it is, I realize I'm running out of time, it is a fairly straightforward issue. I would like to get to the merits if I had time, you know, saying that they completely disregarded the requirement that there be a net conservation benefit to issue these permits, which is clearly defined. You're saying your rebuttal time, which you're entitled to do, but it's your choice. I will reserve the remaining time for rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the court. My name is Rachel Heron on behalf of the U.S. Fish and Wildlife Service. With the court's permission, I'd like to just start by clarifying what's at issue in this appeal and what is not. What's not at issue in this appeal is the barred owl removal experiment. It's that experiment, which is drawing down the population of barred owls  What's also not at issue here is the underlying recovery plan for the northern spotted owl. I don't understand that at all because without these permits, you can't kill the barred owls on the private land. Correct. Okay, so she likes to look at barred owls. She's had a harm. Well, Your Honor, I think this is the issue. Without these permits, the service can't access that private land and kill the barred owl while it's on that land. That is accurate. And they fly. They do fly. And she goes to the campground within their flying range. She likes to see those owls. However, the campground that she is on, on federal land, the owls are also subject to take when they are on federal land. No, I'm just talking about the ones that the government wants to go and shoot that they can't otherwise shoot. That's an owl she won't see. Well, Your Honor, what I'm trying to respond is that if that owl then does go to the federal land where she could see it, the owl can't see it. That's a merits question, isn't it? And not only that, but you wouldn't need the permits then. In other words, if this was all fungible, then these permits had no point. There's obviously a reason why they want to shoot these barred owls there and not wait for them to fly there, one of them being they may not fly there. Certainly, Your Honor. There's no question that it is easier. It makes the, as is stated in the record several times, more efficient. Shortens the potential duration of this experiment, which under the recovery plan is urgently needed. These results are supposed to be, the agency is trying to get them as quickly as possible. So being able to access this private property certainly values. Those are good merits arguments, but we're focusing on whether she has an injury or not. Yes, and so I think the issue then, if the concern, as you stated, is being able to see these barred owls on these particular plots of land, assuming that the service wouldn't be able to get to them in some other way, even if we assume that that's true, the issue is whether they've in fact shown that their members are going to these plots of land. Well, they surely have shown that, it seems to me, with the Coast Range, to be within half a mile at a campground and other campgrounds. It's very, very specific. It's right near these permitted areas. It seems to me that your argument requires considerably more certainty than the standing cases require with respect to the Coast Range. Well, Your Honor, I certainly agree that the Coast Range is the much harder case in terms of the standing argument. For your side, yeah. Yes. I think with regard to Klamath, there's nothing close to that kind of specificity. And I agree with you that it is a very specific showing that we are saying is required here. The plaintiff has said that she is at these campgrounds that are either a half mile or a mile and a half away. The issue is that she has not specifically said that while she is a mile or a mile and a half away, that she is actually either going to those very close by lands or that she is observing the wildlife on them. Certainly, it's conceivable. I mean, these are owls. As you just said, they fly. And they certainly fly a mile. Well, that's correct. They can fly. But I think then we run into the issue that was discussed before that if they fly onto federal land, they are subject to take on that federal— to removal, excuse me, on that federal land. If they're being killed on the land that's a mile away, then they're not going to fly the mile because they're going to be dead. That's true, Your Honor, but if they— And she also specifically says that part of what she enjoys is to view barred owls and search for northern spotted owls. I don't know how much more specific you can get than that. Well, I think that the greater specificity would be some reference to these particular parcels rather than reference to locations that are admittedly nearby. So, in other words, there was nobody who would have standing because nobody's going to get on the land because it's private land. So nobody would have standing. So they'd have to say, I trespassed, and therefore I have standing? No, I would disagree. In fact, I would point out here that, as we've said, the other declaration from Mr. Harris, we have said that this Court should give little weight for separate reasons, but he does point out specific, and we don't dispute that he's mentioned specific parcels that are within the permit areas. Which are Oregon private parcels, is that why? They're Oregon land? They're state land? Some of them, I believe, are state land. And, you know, the plaintiffs have said that this land is public. The only reason for discounting him was because he's a lawyer in the case? There are two reasons that we offered for discounting it. First is that, yes, under this Court's case law, testimony from attorney is taken with great detriment. That's the Court's words to the credibility of that testimony. Did you assume that he lied, that an officer of the Court lied when he said he visited these locations? Is that what you're asking us to say? No, Your Honor. I'm simply saying that under Law OU 1958, this Court says — In your motion to strike, did you have any authority other than the case, the 1958 one, which they point in the reply brief did explicitly say doesn't render him incompetent? That's correct. But in that motion to strike, which I assume the district court never reached, correct? That's correct. Did not reach the issue. Did you offer any other authority other than the 1958 case? I don't have that in front of me right now. But I would, just to clarify on this issue of the 1958 case and what it means, we don't dispute for the purposes of this appeal the question of whether he was competent to testify. The issue raised here is, given that the testimony is in, how much weight does that testimony receive? For standing purposes, if we have to take it as true and he is a competent witness, he visited these areas. You just said he visited these very areas. So what discounting? We're supposed to pretend that he didn't visit them? I don't even understand what it means to discount in this context. It's not like three people said the light was green and he's one of three who said the light was red where you have to balance something. That's a jury confusion issue. The jury's told, well, this person has interest. You can take that into consideration, right, when you have a precipient witness who's a lawyer that's involved, but anyway. Yes. With this issue of jury issue, whether this rule turns on the presence of the jury, that rule is not consistent with the 1958 Law RU case from this court, which in fact dealt with testimony that was given to a tribunal without any jury present, and still the fact testimony from the lawyer was discounted. So what is your other theory? Certainly, Your Honor. The other issue with Mr. Harris' testimony is that it refers to visiting these particular sites years after the complaint was filed and standing as assessed at the time of the complaint. There was then a supplemental declaration filed in which Mr. Harris said that he had formed the intent to go earlier in the process of deciding they were going to bring that case, but then further says that didn't actually take that year in 2017, which was the year that it was planned. So if the other, if Ms. Zucker's allegations are sufficient for standing, we don't have to reach any of these issues about Mr. Harris because he did not support anything with the Klamath study area. That is correct, Your Honor. What's your thought on the earlier footnote, too? It involved Ms. Zucker, correct, but we don't know what her affidavit said. That's correct. I think the bigger issue here is that the challenge in that earlier case was not to these particular permits. It was with regard to the experiment which affects the entire study area, and the government didn't challenge in that case that she had said that she's in that study area. Exactly. Here, you know, if I think the standing case with regard to Klamath certainly, and even with regard to the Oregon Coast Ranges, it would be a closer question certainly for standing if what they were challenging here was the experiment as a whole. I'm a little surprised that you're spending all your time on this as opposed to the immediacy question, which seems to me to have a little more fate, although I'm not sure I totally buy it, but at least it's—so what do you want to say about that? Certainly, Your Honor. So I think that Judge Aiken correctly found that with regard to the northern spotted owl, which is the species that's driving the merits claims here, as the courts pointed out, at the time of the complaint, the plaintiffs offered only speculative theories as to whether there would be northern spotted owls in these particular locations. For example, the Rose—what's the name of this? One of the Schaub's agreements says, this is—the agreement says, the experimental removal of barred owls from the treatment areas are likely to result in some currently unoccupied sites or areas outside of historic sites becoming occupied by spotted owls. I mean, that's the whole premise of this experiment. Yes, it is the hope of the experiment, no question. Or it's likely, and that's not good enough? I think the— I mean, is there a judicial stopper problem here or something? I mean, this is the basis on which the government is going forward, that this is likely. I think the issue, again, is the disconnect between it is certainly hoped for, that there will be some owls that do come in to these study—northern spotted owls that do occupy these current—these areas that were unoccupied at the time as a result of this experiment. The issue is in tracing it to these particular locations that are within these parcel areas, and then specifically within the locations in those parcel areas that the plaintiffs have been near. In environmental cases generally, aren't we always dealing with risks and uncertainties? I mean, whenever somebody says, you know, if this project goes forward, the grizzly bears or the bisons or the marble murrelets are going to be endangered, I mean, it's always a risk problem. It's never that maybe no grizzly bear is really going to be affected at all. And no, it doesn't seem to bother anybody in any of these cases. There's never been a notion that you have to prove that a grizzly bear is actually going to be affected before you can go forward. I agree, and I don't—we're not arguing here that they need to show a certainty. I think that the cases that discuss credible threat and risk, the appropriate line that you can see between them and a case like, for example, Clapper, is whether all of these sort of necessary links in the chain of causation have already occurred but for the injury. Clapper isn't an environmental case. No, it's not. It's also a case in which something actually happened. We just don't know what it is. Your Honor, I agree that the facts of this case are not on all fours of Clapper. So I don't think Clapper is particularly helpful. It seems to me we should look at the environmental cases where you're always predicting the future, always. And the question is how accurately do you have to predict the future? I think—and I think that what Judge Aiken found here was that there was a sufficient disruption in that causal chain posed by this question at the time of standing of whether spotted owls were going to return. I do want to be clear to the Court that based on some preliminary findings that have come out that I've become aware of since the complaint was filed, there may be some good news. The experiment may be drawing some spotted owls to some of these locations. But the question was that Judge Aiken had was at the time of standing, had they shown that it was sufficiently imminent, the risk? And she found that there was this gap in the causal chain that I think— It's rare, though. There aren't cases that say, oh, well, we've got scientific evidence that's predicting it. It's just future. But it is scientifically predicted. That's why we're doing it. Most of those cases involve human intercession where the causal link has to be this person will do something. And we just don't know what people will do. But here it's a scientific prediction. And now you're being commendably frank. It's working. They're coming back. Well, I don't want to overstate the available information. But there may be some signs of that, yes. And I take the point that it is different between sort of scientific prediction. But I would point out as well that the reason that this experiment is going on is because there is considerable uncertainty about what the effect will be. If the agency was, you know, quite certain that this was going to result in a boon for the northern spotted owl population, it wouldn't have been necessary to do this as an experiment first. But in fact— And besides all that, we know that barred owls are going to get killed. That's correct. That barred owls— That's sufficient right there. The issue there with barred owls, as we've said, is not an imminence issue. It's a causation issue with regard to whether it is the experiment itself or these particular permits that are causing the specific harm. And I would agree that there is a question with regard— or at least a disconnect between that barred owl potential harm to the extent this Court deems it sufficient and the merits of the plan. I don't know how that plays out, but it certainly— Certainly, Your Honor. Go ahead. The only other points that I would make to Your Honor, as I see my time is running out, is that, first, to the extent that this Court deems that there is sufficient standing with regard to the Oregon Coast Ranges, we think that any further consideration of the merits should be limited to Oregon Coast Ranges. We think that, at the very least, we do not have the kind of specificity with regard to the Klamath permit that would be sufficient to carry forward on the merits. And with regard to the Court's question of whether it should address the merits, while we did brief the merits, and we certainly agree that the Court has that discretion, the United States would understand if this Court would prefer to send it back to the District Court to let the District Court make an actual finding on those issues in the first instance. Thank you, Counsel. Ms. Best, you have some remaining time. Thank you, Your Honors. First, I'd like to briefly address some of the concerns that came up regarding the Klamath study area. And looking at Ms. Zucker's declaration, she does say that she, you know, has numerous travels for camping and hiking through the Douglas County. And then, in the next paragraph, she explains that, during these visits, she enjoys viewing wildlife, including viewing barred owls and searching for northern spotted owls. And she explains that, in her visits to both areas, she views wildlife and looks at both owls. Therefore, she does explain that she is stopping and viewing wildlife when she's going through the Klamath study area. And that's on paragraph 7 of Ms. Zucker's declaration. Next, I would also like to talk a little bit quickly about how this, there is standing based on plaintiff's interest in barred owls and also in spotted owls. Regarding barred owls, as the court has identified in environmental cases, the court has never required an uncertainty that the harm will occur. And here, Fish and Wildlife Service itself admitted that this was likely. Notably, this is, these permits are 10 to 13 years long. So it was very likely and a very credible threat that they will, in fact, take spotted owl habitat and take spotted owls over the course of the experiment. Well, the other thing about, at least the one agreement I read, I don't know if this is true of the others though, is that they do limit disturbing the owls during nesting, right? And thereafter, through fledging. That's what I read. You're shaking your head. Is that what it says? For a few months during nesting, but not throughout the whole fledging period, correct? Not through the fledging period, but until the birds flew away. And so we're talking, they are talking about a more limited, so the actual take part of it, as opposed to whether the owls are going to come back, is really about the habitat primarily, right? It's about whether they're going to destroy the habitat after the birds are gone after nesting. Wait, I noticed my time has been up, but I would like to answer your question. It is about, yes, the destruction of habitat and also the ability to take spotted owls while they're not nesting. Both are an issue. And notably, the permits do not require any waiting time. They allow for... Spotted owls, I assume you said taking spotted owls. They authorize them to take spotted owls when they're not nesting, correct. They're killing both owls under this permit. And there is no waiting period under the permit. They can destroy spotted owl habitat and take spotted owls immediately. The permits actually authorize the killing of the owls directly, as opposed to doing whatever they otherwise do, i.e., cutting down trees with whatever impact that has? Well, yes, they authorize Fish and Wildlife Service to come onto their land and shoot the barred owls. I know, I'm not talking about the barred owls, the spotted owls. The spotted owls, they're not shooting, correct, Your Honor. That's what I was trying to clarify. Yes, I'm sorry for any confusion there. Yes, yes, they are just taking them through habitat destruction. I notice my time is up. Thank you very much. The case just argued is submitted, and once again, we appreciate helpful arguments from both counsel. We will take about a 10-minute break. All rise.
judges: Graber, Berzon, Higginson